**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| KIRIAKI KOULA TSAHAS,<br><br>Plaintiff,<br><br>v.<br><br>COMMUNITY FOUNDATION NORTHWEST INDIANA, INC. and ST. CATHERINE HOSPITAL, INC.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2:21-cv-279-AZ |

**OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment [DE 130]. On October 8, 2025, the parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). DE 124. On February 13, 2026, Defendants moved for summary judgment. DE 130. On April 4, 2026, Plaintiff filed a response in opposition. DE 138. On May 1, 2026, Defendants filed their reply. DE 150. On September 30, the Court denied the motion and indicated at written opinion would follow. This is that opinion. For the reasons discussed, Plaintiff has marshalled sufficient evidence on disputed issues of material fact which the Court cannot resolve at summary judgment. At this point, Plaintiff's claims can only be resolved by a jury.

**Background**

Plaintiff Kiriaki Koula Tsahas was the Pharmacy Director at St. Catherine Hospital, a position she had held from 1997 until she was fired in 2019. DE 139 (Pl.'s Rsp. To Def.'s Stmt. of Facts) at ¶ 7. She had worked at the hospital since 1994. *Id.* ¶

6. St. Catherine is located in East Chicago, Indiana, has existed for more than a century, and was previously owned and operated by a religious organization. *Id.* ¶¶ 1-2. In 2001, St. Catherine became part of a larger non-profit healthcare corporation called Community Foundation of Northwest Indiana ("CFNI") which runs multiple hospitals in the region. *Id.* ¶ 4. Tsahas was employed by St. Catherine at all relevant times, although St. Catherine's operations intersected with other entities both affiliated and non-affiliated with CFNI. *Id.* ¶ 8.

As part of her duties as Pharmacy Director, Tsahas oversaw a staff of approximately 30 individuals and helped operate St. Catherine's "340B Program." *Id.* ¶¶ 10-12. The 340B Program requires pharmaceutical manufacturers to provide outpatient drugs to "covered entities" at significantly reduced prices (*i.e.*, it imposes price ceilings that a manufacturer may charge covered entities for drugs). According to the U.S. Health Resources & Services Administration ("HRSA"), whose Office of Pharmacy Affairs oversees the program, the purpose and intent of the program is to "stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." *See* HRSA, "340B Drug Pricing Program", https://www.hrsa.gov/opa (accessed Nov. 3, 2026). "The 340B Program is tied to the earlier-enacted, much larger Medicaid Drug Rebate Program." *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 114 (2011). "[M]anufacturers participating in Medicaid must offer discounted drugs to covered entities, dominantly, local facilities that provide medical care for the poor." *Id.* at 115; *see also* DE 139 ¶¶ 15-27. The basic idea behind the program is that covered entities purchase

qualifying drugs from manufacturers at substantially lower prices, bill insurance companies, Medicaid or Medicare at higher non-discounted prices and then reinvest the savings to provide care to low-income, uninsured or other vulnerable patients. It is a large national program and in 2025, "340B covered entities purchased $100 billion in covered outpatient drugs under the 340B Program." HRSA, "2025 340B Covered Entity Purchases", https://www.hrsa.gov/opa/updates/2025-340b-covered-entity-purchases (accessed Nov. 3, 2026). St. Catherine is a covered entity that participates in the 340B Program. DE 139 at ¶ 21.

Not every healthcare facility qualifies for the discounted drugs available under the 340B Program. Furthermore, as general matter and perhaps not surprisingly, covered entities are not supposed to be used as a shell to obtain discounted drugs for nonqualifying patients or non-covered entities. In industry jargon, this practice is known as "diversion." Diversion is the transfer or resale of discounted 340B drugs to ineligible patients who do not qualify for the program, such as hospital inpatients or individuals who are patients at clinics which are not registered under the program or of doctors who do not work for or have an approved arrangement with a covered entity. *See* Congressional Research Service, R48696 "The 340B Drug Discount Program: Litigation Topics and Trends" (Sept. 10, 2025), https://www.congress.gov/crs-product/R48696 (accessed Nov. 3, 2026) ("The 340B statute prohibits covered entities from selling 340B drugs to individuals who are not patients of the covered entity (a practice known as "diversion")."). The statute also

prohibits covered entities from receiving duplicate drug discounts through both the Medicaid program and the 340B program. *Id.*

Prior to October 2019, Plaintiff's employment record as Pharmacy Director appears to have been exemplary. CEO Correa, CFO Trumbo, and Yee "all had a positive impression of Plaintiff and her performance." DE 139 at ¶ 78. For example, during her last performance review in July 2019, Tsahas received a score of "36 out of a possible 37," and was recognized as being "very knowledgeable in the operations of the Pharmacy, especially in 340B" and that her "340B expertise has been recognized by state leaders." DE 152 (Def.'s Resp. to Pl.'s Stmt. of Add'l Fact) at ¶ 1. She likewise received industry awards relating to hospital administration, including one a few days before being suspended and ultimately fired. *Id.* ¶ 3.

While Tsahas as Pharmacy Director oversaw the 340B Program, other stakeholders were involved in its administration including St. Catherine CEO Leo Correa and CFO Lauren Trumbo. DE 139 at ¶¶ 5, 53. Major decisions regarding changes to St. Catherine's 340B Program required the input and approval of all relevant stakeholders. *Id.* ¶¶ 53-56, 58-59.

St. Catherine CEO Correa was also the Chairman of the Board of a company called 219 Health Network, Inc. ("219 HN"). 219 HN is "an organization of physicians," DE 139 ¶ 73, who provide health services in Northwest Indiana (where the telephone area code is 219, hence the name). 219 HN is not a part of CFNI and is a legally distinct entity, although again, Correa worked as both CEO of St. Catherine and Chairman of 219 HN's Board of Directors. Starting in mid-2019, there were

efforts to have patients seen by doctors affiliated with 219 HN receive lower cost prescriptions under St. Catherine's 340B Program. While the record is not entirely clear as to when the idea of this arrangement first began, by July 2019, St. Catherine's outside legal counsel had looked into the possibility of having patients seen by 219 HN receive pharmaceuticals through St. Catherine's 340B Program.

However, there were questions as to the feasibility and legality of such an arrangement. On July 2, 2019, outside counsel Anne Compton-Brown prepared a legal memorandum addressing potential issues. DE 152 at ¶¶ 19-20. Correa's initial reaction upon receiving Compton-Brown's legal opinion was that the proposed relationship between 219 HN and St. Catherine's 340B Program was a "no go," and he passed the analysis on to Tsahas. *Id.* ¶ 21. Although shortly thereafter, and for reasons which are again not entirely clear, Correa spoke with other lawyers and his opinion on the feasibility of the arrangement changed. *Id.* Formalization of the relationship between 219 HN and St. Catherine was put in motion; but all parties agree that 219 HN and St. Catherine did not enter into a formal pharmacy agreement until January 6, 2020, and 219 HN did not start running prescriptions through St. Catherine's retail pharmacy until September 2020. *Id.* ¶¶ 13, 16.

While these discussions began in July 2019, 219 HN appears to have jumped the gun in announcing the 340B Program relationship. On July 12, 219 HN told HRSA that its 340B contract Pharmacy was St. Catherine's with a "start date of October 1, 2019." DE 152 at ¶ 12. This announcement appears to have caused Tsahas to be concerned that 219 HN physicians intended to run prescriptions through St.

Catherine's 340B Program beyond what the regulations permitted and in a way that would risk diversion findings; though those concerns were not articulated until later, as detailed below.

In any event—and setting aside 219 HN for a minute—in September 2019, as part of St. Catherine's annual recertification process of its 340B Program, Tsahas conducted a meeting with some of the relevant stakeholders including CFO Trumbo and Tsahas's direct supervisor Elizabeth Yee, Vice President of Clinical Ancillary Services. DE 139 at ¶¶ 9, 62-64. During this meeting, no changes to patient eligibility criteria were discussed or implemented. *Id.* ¶ 65.

But concerns with the 340B Program at St. Catherine began to surface shortly thereafter. Sometime between July and the end of September 2019, CFO Trumbo observed that St. Catherine's pharmacy expenses were significantly higher than usual. DE 139 at ¶ 80. That is when things began to move quickly and the parties' version of what occurred diverge in a rather dramatic fashion. In short, Defendants assert that over the next few weeks, it uncovered that Tsahas and a member of her staff had made unauthorized changes to patient eligibility for St. Catherine's 340B Program, resulting in *fewer* patients being qualified and the hospital's pharmacy costs spiking. According to Tsahas, however, during that time she raised her concerns regarding 219 HN patient prescriptions being run through St. Catherine's 340B Program (*i.e.*, too *many* patients). When she raised the issue, CEO Correa told her he would fire her if she did not qualify those patients who were, in Tsahas's view, ineligible and thus putting St. Catherine at high audit risk for a "diversion" finding.

A closer examination of what occurred over the period of a few weeks in October 2019 is necessary to put this all into context.

On October 8, 2019, Trumbo emailed Tsahas, asking her: "Have we changed who qualifies for 340B in the retail? We shouldn't have. The retail FY20 SO which is attached, shows significant increases to net revenue, but the supply costs has exceeded this, which is why the bottom line profit is lower than prior year." DE 139 at ¶ 81. Trumbo then had a conversation with Tsahas about the topic. *Id.* ¶ 82. Trumbo testified that during this meeting, Tsahas informed her that a member of her staff, Zorona Dypkowski, "had made a change to the 340B eligibility lookback period from 365 days to 30 days and that she had done so without authorization." *Id.* ¶ 83. Both sides agree that if this occurred, it would be a "dramatic change," which would require 340B Program stakeholder approval because reducing the period would mean "that a patient who had been treated at St. Catherine's by a hospital credentialed physician would no longer qualify for 340B status" if the last day of treatment was more than 30 days in the past (as opposed to 365). *Id.* ¶¶ 84-87. And all agree that no such change had been approved by the necessary stakeholders. Tsahas, however, denies saying to Trumbo or anyone else that the lookback was changed, and she contends to this day that she did not make, authorize, or know about any change to the 340B lookback period (and she appears to not believe any change was in fact *ever* made). *Id.* ¶ 83. Instead, Tsahas insists she merely told Trumbo that she needed time to look into whether Dypkowski did anything improper. *Id.* ¶ 140. She does

acknowledge, however, that during or shortly after the meeting, Trumbo directed her to discipline Dypkowski after Trumbo spoke with Correa. *Id.* ¶ 88.

On October 10, Trumbo met with Tsahas and Dypkowski to discuss rising pharmacy costs. DE 139 at ¶ 93. According to Trumbo, the topic of discussion was the supposed unauthorized change in the lookback period from 365 to 30 days. But again, Tsahas denies discussing any change to the lookback period in this meeting. *Id.* ¶ 95. Instead, she says the conversation related to why St. Catherine's retail pharmacy could not qualify prescriptions originating from 219 HN physicians under St. Catherine's 340B Program if certain criteria were not met. *Id.* Tsahas claims that she expressed a belief that rising costs were due to prescriptions originating from 219 HN physicians that were not eligible under the 340B Program and therefore needed to be purchased at much higher wholesale acquisition costs. *Id.* ¶¶ 100, 107-08, 155. Tsahas says her version of the conversation is supported by a PowerPoint presentation slide that Dypkowski brought to the meeting and that reflected this concern over "diversion."[1] *Id.* ¶ 94.

By October 15, the issues with rising pharmacy costs had not been resolved, and CEO Correa called Tsahas into a meeting to discuss the issue. DE 139 at ¶ 98. Correa "insisted" that changes had been made to the 340B Program. *Id.* ¶ 100. Tsahas denied any changes and told him that the reason for higher pharmacy expenses was related to 219 HN and a change that had occurred on July 1. *Id.* ¶ 103. Correa thought

[1] The PowerPoint slide lists circumstances that could result in a diversion finding, for example, when a physician has privileges at a hospital but maintains a private practice and writes the script at the private practice. *See* DE 133-3 at 23.

Tsahas's explanation "made no sense" (because 219 HN had not yet started purchasing drugs through St. Catherine) and that Tsahas seemed "anxious." *Id.* ¶¶ 101, 104. Correa even called the CEO of 219 HN and placed him on speakerphone to confirm that nothing impermissible was occurring between 219 HN and St. Catherine regarding patient prescriptions. *Id.* ¶¶ 105-108. For her part, Plaintiff concedes that the formal 340B contractual relationship with 219 HN had not yet started; but she appeared to be making a different point that rising costs were due to prescriptions originating from 219 HN physicians could not be qualified under the 340B Program based on the location where the patient was treated and where the medication was prescribed.[2] *Id.* ¶¶ 100, 107-08, 155.

Tsahas testified that at that point, Correa gave her a blunt ultimatum: either start filling prescriptions as directed or "I'll find another director who will." *Id.* ¶ 101. She took this as a threat to her job, and asked for CFO Trumbo to join the meeting, *Id.* ¶ 109. When Trumbo arrived, the three of them discussed a potential computer system issue that could potentially be the source of the problem, and Correa instructed Tsahas to look into it. *Id.* ¶ 110. Tsahas then left Correa's office. After

[2] Plaintiff's articulation of her concerns about 219 HN are a bit muddled in the statements of facts. If 219 HN had not started purchasing drugs through St. Catherine's, what "changes that occurred on July 1, 2019" was she talking about? Based on the PowerPoint presentation and the excerpts of her interview with Myers, it appears she was concerned about 219 HN physicians who had privileges at St. Catherine's prescribing drugs that were not 340B Program-eligible based on the circumstances and location of the treatment and prescription. Whether this was a perceived or actual concern—or fabricated to distract from unauthorized changes that were made to eligibility criteria under her watch—is a factual issue that the jury must resolve. As this stage, the Court must construe all reasonable inferences in Plaintiff's favor. But at trial, Plaintiff will likely need to clarify the gaps in her explanation to convince a jury that she had a genuine concern.

Tsahas left the meeting, Trumbo says she told Correa that Tsahas had previously told her what Dypkowski had done and Trumbo was "surprised" that Tsahas failed to mention it during that meeting. *Id.* ¶ 111-13.

That evening, Tsahas and Correa attended an award dinner for Don Cesco, the CEO of CFNI. DE 152 at ¶ 34. During that dinner, in the presence of others, Correa asked her, "Koula, why do you look so upset? You worried about what pharmacist I'm going to fire next?" *Id.* Defendants "contest this statement" but do not appear to deny that Correa said it at the dinner. Instead, they posit that "there is no evidence that any pharmacists were fired prior to Plaintiff and Dypkowski," presumably to show that the comment must have been related to something else. *Id.*

The following day, October 16, Tsahas and Correa met again in his office. Correa told Tsahas to reach out to St. Catherine's attorney Theodore Van Oehsen if she still had additional concerns about the 340B Program. After that second meeting, Correa contacted CFNI Vice President of Human Resources Anthony Ferracane to express concerns about Tsahas. DE 139 at ¶¶ 116-17. Ferracane recommended having St. Catherine's Director of Human Resources, Diana Myers, look into the matter. *Id.*

Over the next week or so, the issue of and reason for rising pharmacy costs continued to be discussed by hospital staff. First, Tsahas says she emailed Van Oehsen as instructed after her meeting with Correa, but he did not immediately respond. *Id.* ¶¶ 124-25. Second, Tsahas recorded a meeting with her staff in which she repeated that Correa had instructed her to qualify more patients, or he would

find a pharmacy director who would. *Id.* ¶123. A member of the staff asked if Tsahas had spoken to Van Oehsen and she said "no" that she had yet to because she was still waiting for a response. *Id.*

Human Resources Director Myers began her investigation on October 22 by meeting with Correa, Yee and Nancy Moser, CFNI's Vice President of Compliance. DE 139 at ¶¶ 138-39. Myers says that they "all expressed concern" that Dypkowski had manipulated data and Tsahas had not disclosed this to them. *Id.* Myers then met with CFO Trumbo. Trumbo repeated to Myers that Tsahas had told her that Dypkowski "had changed the 340B eligibility period for patients," *id.* ¶ 140, although Tsahas denies that any change was ever made or that she told Trumbo or Correa any such thing. *Id.*

On October 23, Van Oehsen responded to Plaintiff's October 16 email with a set of sample 340B Program policies. DE 139 at ¶¶ 129-133. Defendants say Plaintiff failed to forward this information along to Correa, as he had requested during their prior meeting, but Plaintiff says that while she was in the process of compiling information for Correa, she was called into a meeting with Myers.[3]

Myers and another Human Resources representative then met with Tsahas. DE 139 at ¶ 147. The interview lasted approximately two hours. *Id.* ¶ 148. The parties' respective characterization of the tenor and content of the meeting are hotly

[3] Prior to meeting with Plaintiff, Myers and another Human Resources representative met with Dypkowski. According to Myers, during this meeting Dypkowski "admitted to changing the 340B eligibility criteria from 12 months to 30 days." DE 139 ¶ 144. But Plaintiff points out that Myer's notes from the meeting do not reflect such a change or admission by Dypkowski. *Id.* For reasons that are not clear to the Court, neither party appears to have gotten Dypkowski's side of the story through either deposition or declaration testimony.

disputed; however, Tsahas recorded the meeting (apparently unknown to Myers), and both parties have submitted transcripts based on that recording. According to Myers, "Plaintiff was nervous and evasive during the interview, and struggled to provide coherent answers to questions about changes to the eligibility period," *Id.* ¶ 150. Myers further "observed" that Tsahas only mentioned 219 HN "once" and in her view, only in a positive context. *Id.* ¶ 157.

According to Tsahas, Myers's recollection of the meeting is easily disproven by the recording she made and the transcripts which have been prepared in connection with this litigation. As Tsahas notes, Myers later listened to the recording and agreed it conformed to her recollection of the meeting. *Id.* ¶ 154. For example, she points to at least three instances in the transcript where Tsahas told Myers about what she perceived as Correa's threat to either break the law or be fired. Tsahas repeated to Myers that Correa had told her to "either get your staff to qualify these people for a year, [or] I'm going to find a pharmacy director that will." DE 152 at ¶ 41. Later in the interview, Tsahas told Myers that she was "being fired for trying to adhere to all the laws and regulations of 340B." *Id.* ¶ 42; *see also* DE 139 at ¶ 156. In response to these concerns, Myers told Tsahas to complete an HR-approved "Problem Solving Form" to address the matter. Tsahas asked for such a form but did not receive one that day. DE 152 at ¶ 43.

Later that day, Myers informed Correa, Yee and Moser of her findings. DE 139 at ¶ 158. Myers then made the decision to suspend Tsahas and Dypkowski. *Id.* ¶ 159. Tsahas challenges the idea that Myers had the authority to suspend her given her

seniority and Myers's own statements at the start of her interview with Tsahas that "I make recommendations based on information the comes before me. I don't tell anybody what to do." *Id.* Correa denied however that he made the decision to suspend Tsahas, so the record is murky at best as to who had the authority and who made the call to suspend the two. Tsahas's suspension was not, however, communicated to Tsahas on October 23 or even that same week.

Rather, two days later, on the evening of October 25, 2019 (a Friday), Tsahas attended another award ceremony. This time, it was Tsahas who received an award. She received the State of Indiana Caregiver of the Year Award from the Indiana Hospital Association. DE 152 at ¶ 47. Her supervisor Yee spoke at the ceremony. *Id.* According to Yee, at this point and despite apparently being informed of Myers' findings (and the decision to suspend Tsahas) two days before, Yee said she did not know that Tsahas's job was in jeopardy as of that evening. *Id.* ¶ 6.

On Saturday, October 26, things escalated further. Tsahas submitted a formal complaint against Correa, via St. Catherine's "EthicsPoint" hotline. DE 139 at ¶ 163. Tsahas stated that "on October 16, 2029, Leo Correa threatened to terminate her if she didn't perform what would have been an illegal activity. Leo asked [Plaintiff] to get the pharmacy staff to qualify patients in contravention of published audit guidance, which would have resulted in a diversion finding. When [Plaintiff] pointed this out, Leo's response was, 'either get your staff to do it or I'll find another director who will.'" *Id.* ¶ 164. While Plaintiff stated in her original complaint that the problem

had been ongoing for 1-3 months, she later corrected "that the applicable time period should be 1-3 weeks." *Id.* ¶¶ 165-66.

On Monday, October 28 and Tuesday, October 29, Tsahas took leave and did not come into the office. Nonetheless, on October 28, Myers prepared a "Notice of Corrective Action" documenting the suspension of Tsahas and Dypkowski due to "failure to follow approval process," "failure to adhere to compliance guidelines," and "inconsistent facts and information provided." DE 139 at ¶¶ 161-162. At the time this was prepared, Myers stated she was unaware of Tsahas's EthicsPoint complaint against Correa. *Id.* ¶ 168. Yee, despite testifying that she was unaware of any such issue as late as the Friday evening before, signed the Notice of Corrective Action along with Myers. It was not sent to Tsahas that day, however, and she was not immediately made aware that she had been suspended as a result of Myers's investigation.

On Wednesday, October 30, Tsahas returned to work, but found that the key to her office did not work. DE 139 at ¶ 169; DE 152 at ¶ 52. Tsahas says she came into the office to obtain the "Problem Solver Form" which Myers had suggested she fill out but failed to provide her with when they had met on October 23. Tsahas requested the form and Myers's assistant gave Tsahas the "Problem Solver" form after which Tsahas learned she was suspended and subject to a "Notice of Correction Action."[4] Two security guards then met Tsahas and escorted her out of the building. DE 139 at ¶ 172. Who exactly alerted or called for the security guards to intervene is

[4] Defendants contend that they provided notice of the suspension by FedEx and U.S. Mail on October 28, 2025. DE 152 at ¶ 51.

unclear. Correa did not recall ordering the security guards to escort Tsahas out. DE 152 at ¶ 57. Regardless, the security guards' written reports stated that Correa had been the one to order her removal. *Id.* ¶ 58. And while Tsahas testified to being upset over being escorted out of the building after 25 years of working at St. Catherine, video surveillance footage suggests it all occurred without major incident. DE 139 at ¶¶ 174-75.

With Tsahas and Dypkowski suspended, Myers continued her investigation, although exactly what that entailed is not spelled out in Defendants' statement of facts or underlying evidence. *See id.* ¶ 176. What is clear, however, is that Myers did not speak again with Tsahas or Dypkowski, despite Tsahas filing a formal complaint about Correa since the two last spoke. Nor does it seem that any forensic audit or similar type of investigation into the supposed manual manipulation of data or change to the "lookback period" occurred within St. Catherine's computer system.

By November 11, the investigation wrapped up, and Myers again "concluded that Dypkowski had engaged in manipulating hospital data and records to effectuate the modification of a Hospital policy – namely reducing the 340B look-back period for certain prescriptions from one year to 30 days." *Id.* ¶ 181. Myers further concluded, "that [Tsahas] was aware of Dypkowski's modifications to the policy and either agreed with it or approved it" without authorization. *Id.* ¶ 182. Myers recommended to Yee and Correa that Tsahas's and Dypkowski's employment be terminated. *Id.* ¶ 186. Yee and Correa agreed (although again, Correa denies he was the one who made the decision to fire Tsahas), *id.* ¶ 187, and on November 12, Myers informed Tsahas that

she was fired for "failure to follow approval processes and failure to obtain approval." *Id.* ¶ 188.

After that, Tsahas alleges that her former supervisors and coworkers decided to add insult to injury by spreading false statements about her. Specifically, she says that Yee, her former supervisor, spoke with JoAnne Birdzell, St. Catherine's former CEO and a friend of Tsahas, and told Birdzell that Plaintiff "had been fired for violations of the 340B program and for over-qualifying patients for the 340B Program"). DE 140-8 (Decl. of J. Birdzell) at ¶¶ 5-6. Birdzell claims these statements did not square with what she knew of Tsahas or her experience, so she did not believe them to be true. *Id.* Tsahas further testified that through the grapevine, she heard that two other Pharmacy Directors, Michelle Myers and Elizabeth Clements said similar things, namely that Tsahas was fired for over-qualifying patients and other violations of the 340B Program. DE 139 at ¶¶ 197-98. The parties agree that an audit conducted after Tsahas was fired revealed instances where prescriptions were being over-qualified. DE 152 ¶ 60. But it is not explained in the facts when these audit findings were made in relation to the alleged statements described above.

## Discussion

### I. Legal Standard

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must construe all facts in the light most favorable to and draw all reasonable inferences in favor of the

non-moving party, *Murphy v. Caterpillar*, 140 F.4th 900, 905-06 (7th Cir. 2025), but the moving party can prevail "by showing an absence of evidence to support" the non-moving party's claims. *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020). The Court does not draw every conceivable inference in the nonmoving party's favor, however, and inferences supported only by speculation or conjecture cannot defeat summary judgment. *Bishop v. Air Line Pilots Ass'n Int'l*, 5 F.4th 684, 693 (7th Cir. 2021). In a similar vein, viewing the facts in the light most favorable to Tsahas does not mean the Court's inquiry focuses solely on sincerity of her belief that she was retaliated against for unlawful reasons. That is not the Court's role at summary judgment. Even the sincerest beliefs, without evidence and an objective basis in fact, are insufficient to overcome a motion for summary judgment. Nor can the nonmoving party overcome an otherwise valid motion for summary judgment by disputing evidence solely on the basis of allegations or conjecture. Evidence must be cited because this is the "put up or shut up" moment of a lawsuit. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020).

The False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3732, makes it unlawful for any person to defraud the United States Government by making false claims for payment against it. The FCA contains a "whistleblower provision" which protects employees who help bring such actions or warn their employers about false claims or fraudulent activity implicating the FCA:

> Any employee ... shall be entitled to all relief necessary to make that employee ... whole, if that employee ... is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of

> employment because of lawful acts done by the employee ... in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). In other words, the required elements of an FCA retaliation claim that Tsahas will need to prove are: (1) that her actions were taken in furtherance of the statute (*i.e.*, protected activity), (2) that St. Catherine knew that she engaged in this protected conduct (*i.e.*, it had notice), and (3) that St. Catherine retaliated against her at least partially because of the protected activity (here, by suspending and firing Tsahas). *See Lam v. Springs Window Fashions, LLC*, 37 F.4th 431, 436–37 (7th Cir. 2022). FCA retaliation claims are conceptually similar to Title VII employment retaliation claims, *see Gnutek v. Illinois Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023) (listing similar elements for Title VII retaliation claim), except that the two have slightly differing causation standards, as discussed *infra*.

That said, it is important to remember that in employment retaliation cases, courts do not "sit as a super personnel department to review an employer's business decision." *Ritter v. Hill 'N Dale,* 231 F.3d 1039, 1044 (7th Cir. 2000). The law gives employers legitimate discretion in making important decisions relating to hiring and firing. The FCA's whistleblower protections do not prohibit mistakes or even poor judgment on the part of an employer. Nor does it insulate employees from their own mistakes or poor judgment. It prohibits unlawful retaliation for engaging in protected activity and that is all.

In the end, the legal standard at the summary judgment stage in employment retaliation cases "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected activity] caused the discharge or

other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("Evidence must be considered as a whole…") (rejecting the approach of sorting direct evidence from indirect evidence).

## II. Analysis

Defendants argue that they are entitled to summary judgment for four primary reasons. First, Defendants argue that Tsahas never engaged in "protected activity." They say that she never made a "good faith complaint about fraudulent activity against the government," and instead only raised generic "concerns about regulatory noncompliance" which cannot as a matter of law trigger FCA whistleblower protection. DE 131 at 1.

Second, they claim that Tsahas failed to provide sufficient notice of her protected activity to Defendants as required to prove an FCA relation claim. As such Defendants posit that "Plaintiff cannot possibly establish that there was a causal connection between any allegedly protected activity and her dismissal." *Id.*

Third, and somewhat relatedly, Defendants assert that the undisputed evidence shows they fired Plaintiff for legitimate and therefore lawful reasons relating to her authorizing or approving changes to St. Catherine's 340B Program without permission and for refusing to accept responsibility. *Id.* In doing so, they argue that there is no evidence of pretext and therefore nothing for a jury to decide.

Fourth, separate and apart from the FCA retaliation claim, Defendants argue they are entitled to judgment as a matter of law on Plaintiff's state law defamation claim relating to statements allegedly made by other employees about the reasons why Plaintiff was fired by St. Catherine.

Plaintiff unsurprisingly disagrees with each of these arguments. Furthermore, and critically given the summary judgment posture, she argues that the evidence shows (or at a minimum creates a disputed question of fact) that her dismissal was pretextual and the result of her raising concerns about Correa's efforts to divert federal government-subsidized and discounted pharmaceuticals from St. Catherine.

As discussed herein, while each of Defendants' arguments are supported by some evidence and the current state of the law, on the other side of the ledger, there is more than sufficient evidence which legitimately undercuts each of them and which a reasonable jury could use to find in favor of Plaintiff. Therefore, disputed issues of material fact exist, and the Court cannot grant summary judgment.

**A. Whether Plaintiff Engaged in Protected Activity Under the FCA.**

Defendants argue that Tsahas never engaged in any "protected activity." DE 131 at 11-12. They argue that she never made a "good faith complaint about fraudulent activity against the government," and instead, at most, raised generic "concerns about regulatory noncompliance" which do not legally qualify. *Id.* The Court addresses these two related arguments in reverse order.

Concerning fraud versus generic regulatory noncompliance, Defendants do not strictly argue that the FCA does not apply to the 340B Program; they suggest that Tsahas's concerns did "not involve fraud or the type of conduct that the FCA is intended to protect against, but rather a regulatory disagreement that is insufficient to support an FCA retaliation claim." DE 131 at 7.

Recently (after Defendants' motion was filed), the Ninth Circuit held that violations of the 340B Program could plausibly form the basis for an FCA claim, even though the 340B Program itself does not have a private right of action and any remedies (at least for overcharges by drug manufacturers) must be sought through the statute's "administrative enforcement mechanism." *U.S. ex rel. Adventist Health Sys. of W. v. AbbVie Inc.,* 169 F.4th 1137, 1140 (9th Cir. 2026). Because an FCA *qui tam* lawsuit is brought *on behalf of the government* for overpayments made *by the government*, the fact that covered entities must use HRSA's administrative remedies to recover for alleged harms *to covered entities* does not exempt false claims relating to the 340B Program from the FCA. *Id. at* 1143 ("Our precedent makes clear that FCA claims are available to parties even when other statutory causes of action are unavailable"). The *Adventist* case is factually different from this one; it involved allegations that drug manufacturers fraudulently charged inflated prices to a 340B Program covered entity, which indirectly caused Medicaid and Medicare to reimburse the covered entity at the inflated prices. *Id.* at 1145 ("Standing in the shoes of the government, Adventist seeks statutory damages for the false or fraudulent claims that defendants caused covered entities to submit to the government, not compensatory damages for overcharges incurred as a result of defendants' violations of Section 340B…").

Defendants brush aside Plaintiff's concerns about 340B diversion as a "regulatory" dispute. But that is a bit of a red herring in light of the *Adventist* decision, which explains that the mere fact that a particular 340B violation can be

remedied through a non-judicial administrative process does not by itself exempt the alleged violation from the scope of the FCA. The Court finds this aspect of the Ninth Circuit's reasoning persuasive. The *Adventist* case did not, however, address whether or not fraudulent conduct resulting in diversion can form the basis of an FCA claim. Applying the reasoning of the *Adventist* decision, the answer likely turns on whether the alleged fraudulent conduct at issue directly or indirectly caused materially false claims to the government in exchange for payment. Neither party directly addresses this issue in their briefs. Defendants hint at this but they have not provided sufficient case law or analysis to foreclose the possibility on summary judgment that Plaintiff's concern and belief that Correa was pressuring her to intentionally falsify 340B eligibility determinations could directly or indirectly cause a false claim for payment to be submitted to the government or result in false certifications by the hospital that would result in the same. For her part (and perhaps because Defendants did not squarely address this issue), Plaintiff does not explain the connection between her expressed concerns and complaints about fraudulently over-qualifying patients to a possible submission of false claims for payment to the government. Without the benefit of developed legal and factual arguments by either side, the Court will not attempt to resolve this thorny question on its own at this time.

In any event, Plaintiff is not required to prove that an actionable FCA violation occurred in order to establish that she engaged in protected activity. Rather, the statute protects any activity "in furtherance of an [FCA] action … or other efforts to stop 1 or more violations of [the statute]." 31 U.S.C. § 3730(h)(1). As Plaintiff correctly

points out, the FCA's antiretaliation provisions kick in somewhere between when an employee "just imagines fraud without proof" and "while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Fanslow v. Chicago Mfg. Center, Inc.*, 384 F.3d 469, 481 (7th.Cir. 2004).

The Seventh Circuit has held that an employee engages in protected activity if she genuinely believes, and a reasonable employee could believe, that the employer is committing fraud on the government. *United States ex rel. Sibley v. University of Chicago Med. Ctr.*, 44 F.4th 646, 662-64 (7th Cir. 2022). In other words, protected activity in the context of the FCA requires both subjective (*i.e.*, a genuine) and objective (*i.e.,* reasonable) belief that fraud is occurring. Which brings us to the real crux of the issue: whether there is sufficient evidence that a jury could find that Tsahas's concerns within the 340B Program at St. Catherine were objectively reasonable and genuinely believed by her to be potential violations of the FCA which would qualify as protected activity.

On the objective reasonableness issue, Defendants rely on a line of FCA cases in the healthcare industry where plaintiffs were found to have not had a reasonable good faith basis to suspect fraud because their supposed concerns were based on allegedly illegal practices which were far afield from the submission of false claims for payment to the government. In *Trupp v. Roche Diagnostics Corp.*, 440 F. Supp.3d 990 (S.D. Ind. 2020), the court granted summary judgment in favor of an employer because the employee-plaintiff failed to offer any evidence that she had a good faith basis to believe the employer was committing FCA violations or that a reasonable

employee would have suspected fraud. The court found that any "false claims for payment" would not have come from plaintiff's employer (a medical device company which knew of off-label use of its devices) but instead that the employer's customers may have repeated communications by the employer when it billed the government. *Trupp*, 440 F. Supp.3d at 997-98. "[A]t all relevant times" plaintiff's concerns related to "customer education and patient safety," *not* fraud. *Id.* at 998 (emphasis in original). This led the court to conclude that plaintiff "never held the subjective belief that Roche was committing fraud against the government, which dooms her FCA retaliation claim." *Id.* There was thus no reasonable basis to conclude she had engaged in protected activity sufficient to be afforded FCA whistleblower protection.

Likewise, in *Cabotage v. Ohio Hosp. for Psychiatry, LLC*, 2013 WL 1281940, at *5 (S.D. Ohio Mar. 26, 2013), the employee-plaintiff's complaints were related to allegedly dangerous care provided by a particular doctor and that plaintiff had no knowledge concerning the submission of any claim to the government.

Finally, in *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730 (7th Cir. 1999), the Court affirmed summary judgment in favor of an employer in an FCA retaliation lawsuit where the alleged illegal conduct at issue fell short of anything fraudulent or implicating the FCA. The plaintiff's allegations related to the extent of testing done on blood plasma sold by the defendant which in the court's view came down a dispute over best practices relating to testing protocols. *Luckey*, 183 F.3d at 733 ("[T]here is no evidence that Baxter intended to deceive anyone about what it was doing, or the validity of the test results. All this record reveals is a dispute about whether Baxter's

testing protocols could be improved."); *id.* at 732. ("Only in Humpty Dumpty's world of word games would anyone apply the label 'fraud' to the kind of representations Baxter made.").

The Court agrees with Plaintiff that each of these cases is distinguishable and of little instructive value. As explained above, the *Adventist* decision opens the door to the possibility that a regulatory violation of the 340B Program may form the basis of an FCA claim if the allegedly fraudulent conduct was causally connected to the submission of false claims of payment to the government. And while Plaintiff's complaints lack complete clarity, as Defendant's own cited authority makes clear, "magic words" such as "false claim act violation" or even "fraud" are not always required for purposes of an FCA whistleblower retaliation lawsuit. *Lewis v. AbbVie, Inc.*, 152 F.4th 807, 814 (7th Cir. 2025) (cited by Defendants at DE 150 5-6). Construing all reasonable inferences in Plaintiff's favor as required at this stage, Plaintiff has presented sufficient evidence that she complained that St. Catherine was attempting to fraudulently divert prescriptions by claiming certain patients falsely qualified when they did not, and the patients' qualification entitled Defendants to falsely purchase drugs at discounted price and presumably receive payments for reimbursement from government programs such as Medicare or Medicaid. Whether this was actually occurring or not, all parties seem to agree if it was, it would be contrary to the 340B Program's requirements, and the question as to whether that conduct could constitute a bona fide violation of the FCA has not been presented to the Court. Therefore, and because Defendants have not presented

sufficient legal or factual analysis to conclude at this time that Plaintiff's expressed concerns were objectively unreasonable as a matter of law, the Court will not grant summary judgment on that basis.

Turning to whether Tsahas's belief that fraud was occurring was genuine or subjectively true, Defendants argue that "Plaintiff's failure to utilize legal resources available to her to address her supposed regulatory compliance concerns reflects that her 'concerns' were not in good faith but rather were an attempt to distract from her own poor judgment changing the 340B patient criteria without the approval of St. Catherine leadership." DE 131 at 7. In support they point to her failure to raise these issues with the compliance department or with St. Catherine's outside legal counsel prior to filing her ethics complaint or being fired.

Defendants characterize Tsahas's inaction in this regard as "puzzling," "lackadaisical," "nonsensical," and that it "rings hollow" and "strains credulity." DE 131 at 7-8. Defendants suggest that her failure to tell St. Catherine's counsel that she thought the CEO was asking her to engage in illegal conduct means she could not possibly have had an objective good faith basis to believe anything was amiss. *Id.* That is certainly one way to view the evidence, and the Court imagines Defendants will pursue that strategy at trial to undermine Plaintiff's expected testimony. But it also relies on a bit of speculation and at least some major inferences and therefore cannot serve as a basis to grant summary judgment. As Tsahas notes, the evidence shows she did reach out to counsel after her October 16 meeting with Correa; he simply did not get back to her for a week. DE 139 at ¶¶ 124-25. And months prior to

that, St. Catherine had received a legal opinion from outside counsel indicating that the proposed arrangement between 219 HN and St. Catherine might not be legally feasible, something Tsahas had been involved with since the beginning. DE 152 ¶¶ 19-23. There is also of course the evidence which shows Tsahas raised her concerns with CFO Trumbo during her meeting prior to speaking with Correa and during her subsequent interview with Myers. In other words, viewing the evidence in a light most favorable to Tsahas, the record does not show that she sat idly by and kept her concerns over diversion within St. Catherine's 340B Program to herself. Far from it.

Lastly, Plaintiff argues that Defendants are judicially estopped from arguing that Plaintiff did not have a good faith subjective belief that Defendants were committing fraud because of a comment that one of Defendants' attorneys made during a hearing to resolve discovery disputes. DE 138 at 12-13. Plaintiff argues that Defendants conceded the issue of her subjective belief and agreed to withdraw their affirmative defense that "Plaintiff's allegations fail because they are based on a misunderstanding or misinterpretation of federal law, the federal 340B Drug Program, and the compliance actions required therein" in order to avoid a deposition of their attorney Ms. Compton-Brown.

Plaintiff misinterprets what was stated at the hearing and the Court's ruling. At the hearing, the Court questioned both the relevance of Ms. Compton-Brown's deposition and the purpose of the affirmative defense, the latter of which had put Ms. Compton-Brown's testimony at issue but did not advance the issues in the case. The Court commented that whether or not Tsahas was right or wrong on her

interpretation of 340B regulations was irrelevant to the issues in this case because the pertinent question was whether she had a sincere or good faith belief that Defendants were committing fraud when she complained. With Defendants' agreement, the Court struck Defendants' affirmative defense on the issue and denied leave to take the deposition. DE 122.[5]

During the discovery hearing, one of Defendants' attorneys commented, "through discovery, it has become clear to us, honestly speaking here, *and we've not done anything formally with this*, that we believe that Ms. Tsahas believed what she thought -- she was trying to do the right thing." DE 135, 9/25/2025 Hr'g Tr.at 24:24-25:3 (emphasis added). The Court does not find that this comment and the context in which it was made amounts to a legally binding concession. Judicial estoppel is an equitable doctrine invoked at the Court's direction to prevent parties from taking contrary positions in litigation when it suits them and to another litigant's detriment. *Kaiser v. ALCOA USA Corp.*, -- F.4th -- No. 25-1627, 2026 WL 2364300, at *8 (7th Cir. Aug. 14, 2026) ("Judicial estoppel 'bars a party from prevailing on a position in court and then taking the opposite position at a different stage or in new proceedings.'") (citation omitted). There is no "general formulation of [the] principle" of judicial estoppel but in considering its use the Court looks to whether: (1) "a party's later position [was] clearly inconsistent with its earlier position;" (2) "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial

[5] The Court's discovery order incorrectly refers to the affirmative defense at issue as Defendants' Affirmative Defense No. 3. This is a typo. It is clear from the text and quoted language in the order that the Court was referring to Affirmative Defense No. 2

acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled;" and (3) whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)).

As explained above, the Court struck the affirmative defense and prohibited the attorney deposition because they were irrelevant to the issue of whether Plaintiff subjectively believed in good faith that Defendant was committing fraud. DE 135 (9/25/2025 Hr'g Tr.) at 26:14-21 (THE COURT: ... I don't really think [it] is a necessary affirmative defense, and I think it's creating confusion. Because you don't need to make that assertion to establish that her internal complaint wasn't in good faith, whether or not it's actually wrong [on] the law. It's really from her perspective. Whether or not it's good faith is whether or not from her perspective, whether she had a genuine belief in it."). During the colloquy, Defendants' attorney made what the Court considers a stray comment that it appeared Plaintiff sincerely believed she was doing the right thing. But counsel stressed that "we've not done anything formally with this [assessment]." DE 135, Hr'g Tr. at 25:1. And the Court specifically acknowledged that it was "not holding you to [that assessment]." *Id.* at 25:11-12. Accordingly, the Court did not rely on Defendants' counsel's comment to deny the deposition of Ms. Compton-Brown and does not construe counsel's comment as a legally binding concession that amounts to judicial estoppel. Defendants are free to

argue at trial that Plaintiff did not subjectively believe that Defendants committed fraud and therefore did not engage in protected activity.[6]

**B. Causation and Whether Defendants Knew of Plaintiffs' Protected Activity.**

Defendants argue that Plaintiff "fails to establish that Defendants knew she was engaged in conducted [*sic*] protected [conduct] under the FCA." DE 131 at 9. This argument concerns what is known as the "notice requirement" of an FCA whistleblower retaliation claim. Defendants say the undisputed evidence shows that Tsahas "never complained to Defendants about fraud…either in her discussions with defendants or any written communications expressing her concerns." *Id.* They further point out that she was interviewed by Human Resources shortly before her termination and never mentioned any fraud or similar concerns. At best they say, any concerns raised by her were unrelated to fraud. *Id.* The Court disagrees with Defendants because there is sufficient evidence in the record which creates a disputed issue of material fact as to each of these issues.

"The notice requirement is not particularly onerous, but it is essential." *Lewis*, 152 F.4th at 814. "All it asks is that the employee convey to h[er] employer that [s]he suspects fraud." *Id.* (citing *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1272 (10th Cir. 2023)). A plaintiff need not have knowledge of

---

[6] The Court does, however, find Defendants' arguments (based on the testimony of their own counsel) that the 340B Program gives "significant discretion" to covered entities and its citation to *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp.3d 312 (D.S.C. 2023)—an Administrative Procedures Act challenge to the HRSA's interpretation of the term "patient" as used in the 340B statute which does not have apparent relevance to this case–immaterial to the issue of whether Plaintiff engaged in protected activity.

the FCA, "nor utter any magic words like 'False Claims Act,' but he must make it clear that his complaints were 'aimed at preventing the [employer's] submission of false or fraudulent claims' to the government." *Id.* (quoting *Singletary v. Howard*, 939 F.3d 287, 300 (D.C. Cir. 2019)). "[M]erely informing an employer it is not complying with a statutory, regulatory, or contractual requirement" is not sufficient. *United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co., Inc.*, 48 F.4th 1146, 1160 (10th Cir. 2022). "The logic of the notice requirement is clear: only if the employer is aware that its employee is engaging in ... the protected conduct of the FCA can the employer fire the employee 'because of' the employee's protected conduct." *Lewis,* 152 F.4th at 815 (quoting *United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1238 (D.C. Cir. 2012)) (alterations in original).

"In the typical FCA fraud case where an employee whistle blows on the firm directly submitting false claims, satisfying notice is practically co-extensive with the protected conduct element." *Lewis,* 152 F.4th at 815. "For instance, an employee who complains about his boss submitting false invoices to the government for payment need say little more to satisfy notice because the conduct is so obviously linked to fraud." *Id.* (citation omitted). This is not such an obvious case. Tsahas has marshalled sufficient evidence to establish that she complained of fraud. If you believe her version of the conversations she had with Trumbo, Correa and Myers, she was pressured by Correa (under threat of termination) to falsely qualify patients that were ineligible for discounted drugs under the 340 Program regulations and she resisted and complained about these commands. But as explained above, neither

party has adequately addressed—other than in a conclusory manner—whether Plaintiff's allegations of fraudulent over-qualifying of patients could plausibly be connected to false submissions for payment to the government.

Plaintiff testified that she raised the issue of diversion with Trumbo in their first meeting on October 8. She points to the "over a dozen times" she discussed issues of rising pharmaceutical costs and how lowering them through impermissible approvals during her meeting with Human Resources would be against the rules of the 340B Program. DE 138 at 17 (citing DE 133-10 at 3,4,6,8,14,16,17, 20-21, 37, 43, 46-47, 48, 50, 52, and 67). She quotes what could fairly be called her "smoking gun evidence," the formal ethics complaint she made against Correa two days before she was suspended and in in which she stated in plain English that "Correa threatened to terminate her if she didn't perform what would have been an illegal activity…which would have resulted in a diversion finding." *Id.* Of course, much of the notice occurred only shortly before Plaintiff was suspended, but that is the very essence of her case. Tsahas's theory, boiled down to a sentence, is that almost immediately after she complained in writing that Correa was asking her to do something illegal and potentially fraudulent, the wheels were put in motion to fire her through pretextual means.

But this is not the end of the notice analysis. There remains an open factual question as to whether Plaintiff's complaints about falsely over-qualifying patients put Defendants on notice about conduct that could result in the fraudulent or false submission of claims for payment to the government. Thus, for the same reasons the

Court is denying summary judgment on the issue of protected activity, the record has too many holes for the Court to grant summary judgment on the issue of notice.

Lastly, Defendants argue, in a footnote, that "a but-for causation standard should apply to FCA retaliation claims." DE 131 at 10, n.6. This argument stems from the idea that in *Fanslow*, 384 F.3d at 485, the Seventh Circuit based the causation standard for FCA retaliation claims on "Title VII retaliation principles," which, after the Supreme Court's decision in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013), require a more stringent but-for causation standard (rather than "at least partially because of" standard stated in *Fanslow*). Defendants concede that the Seventh Circuit has not adopted the standard they advocate for. *See Heath v. Indianapolis Fire Dep't*, 889 F.3d 872, 874 (7th Cir. 2018) ("We have not yet revisited *Fanslow* to extend *Nassar's* Title VII holding to § 3730(h)(1), though the similarity of the two provisions might give us reason to do so in a future case.").

Still, they direct the Court to decisions from other circuits which have adopted but-for causation in FCA retaliation cases and urge it to follow their lead. DE 131 at 10, n.6 (citing *DiFore v. CSL Behring, LLC*, 879 F.3d 71, 78 (3d Cir. 2018) and *U.S. ex rel. King v. Solay Pharm., Inc.*, 871 F3d 318, 333, (5th Cir. 2017)). The Court declines to break new ground and it remains bound to follow *Fanslow* as the law of this circuit. Indeed, the Seventh Circuit has continued to use the "at least partially" motivated by protected activity causation standard even after potentially calling it into question in *Heath*. *See Lam*, 37 F.4th at 437 (decided four years after *Heath*). The Court must follow the Seventh Circuit's precedent until it or the Supreme Court

tells it otherwise. *See Schoenthal v. Raoul*, 150 F.4th 889, 923 (7th Cir. 2025) ("Unsettled areas of the law are nothing new. We cannot yet know if these are legal growing pains that will subside with age, or if they signify a malady in need of a cure. And, for all that lower courts may think, our job is to apply binding precedent.").

Either way, this is largely academic in the context of this case because but-for causation does not mean sole or exclusive causation. *See, e.g.*, *Xiong v. Bd. of Regents of Univ. of Wisconsin Sys.*, 62 F.4th 350, 355 (7th Cir. 2023). ("If an adverse employment action is the result of two different causes—one prohibited by Title VII and the other permissible—then summary judgment should not be granted to an employer."). Even if Tsahas was required to satisfy a higher causation standard, she has adduced sufficient evidence to have a jury decide the issue.

**C. Whether Defendants' Reasons for Plaintiff's Dismissal were Legitimate or Potentially Pretextual.**

Finally, Defendants argue that there were wholly legitimate reasons why St. Catherine fired Tsahas and no evidence of any pretext and are therefore entitled to judgment as a matter of law. Once again, the Court disagrees because the evidence is far from definitive as Defendants would like to believe.[7]

"Pretext is defined as 'a dishonest explanation, a lie rather than an oddity or an error.'" *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015) (quoting

---

[7] The Court notes that neither side has presented its case formally through the *McDonnell Douglas* burden-shifting framework common in employment cases. Nor is it necessary under these circumstances. *See Vassileva*, 118 F.4th at 874 ("Where a defendant offers a nondiscriminatory explanation for its employment decision, as here, the prima facie case and pretext inquiries often overlap, so courts may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext.") (cleaned up).

*Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002)). "To show pretext, a plaintiff 'must do more than simply allege that an employer's stated reasons are inaccurate; [she] must still have some circumstances to support an inference that there was an improper motivation proscribed by law.'" *Vassileva v. City of Chicago*, 118 F.4th 869, 874 (7th Cir. 2024) (quoting *Tyburski*, 964 F.3d at 599). Even if St. Catherine's reasons are "inaccurate, unfair, foolish, trivial, or baseless," the reasons are still not pretextual if "honestly believed" and not based on something dishonest or false. *Barnes-Staples v. Carnahan*, 88 F.4th 712, 716 (7th Cir. 2023) (cleaned up). Proving pretext requires a plaintiff to "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find it unworthy of credence." *Murphy*, 140 F.4th at 914 (internal citation omitted).

Pretext can take many different forms and it must be evaluated in the context of each case, but shifting explanations are something of a hallmark. *E.g.*, *Murphy*, 140 F.4th at 915 ("We have long held that an employer's shifting and inconsistent explanations for an adverse employment action can support an inference of pretext.") (citations omitted); *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) ("One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision."). "[T]emporal proximity between an employee's protected activity.... and an adverse employment action rarely suffices alone to support an inference of a retaliatory motive." *Vassileva*, 118 F.4th at 875 (citing *Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 634 (7th Cir.

2022)); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 221 (7th Cir. 2015) ("[S]uspicious timing alone is rarely sufficient to overcome a motion for summary judgment"). That said, temporal proximity between protected activity and an adverse employment action remains relevant and can defeat summary judgment under the appropriate circumstances—typically when coupled with some other circumstantial evidence of pretextual retaliation. *See Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 849 (7th Cir. 2007) ("The causal link of a retaliation claim is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action.") (quoting *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 793 (7th Cir. 2007)) (reversing grant of summary judgment in favor of employer). "From evidence of pretext, a trier of fact may, but is not required to, infer the employer acted with an unlawful motive." *Murphy*, 140 F4th at 911 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, (1993)).

So, what does the evidence show when Defendants' evidence of legitimate reasons is compared to Plaintiff's evidence of pretext? Defendants' evidence boils down to the fact that Trumbo and Myers both testified that Dypkowski and Tsahas readily admitted to them multiple times to changing (or allowing the change) to the lookback period without authorization and then were evasive when asked about it. If true and believed in good faith by the decisionmaker, this could readily be a legitimate basis to discipline an employee, including maybe even firing them.

But Tsahas's evidence, on the other hand, likewise puts together a plausible story of pretext. The timing here strikes the Court as especially significant. There was only one material event between Friday, October 25—when Tsahas's supervisor Yee attended an award ceremony honoring Tsahas, spoke glowingly on her behalf, and testified she had no idea Tsahas's job was in jeopardy—and Monday October 28, when Yee and Myers signed a Corrective Action Notice suspending Tsahas. And that was Tsahas filing a formal complaint in which she alleged that Correa threatened to fire her unless she engaged in illegal diversion. Nor does the Court need to rest its conclusion on temporal proximity alone, as Tsahas points to additional circumstantial evidence which fairly raises the specter of pretext. This includes: Correa's statement at dinner with Tsahas where he asked her if she was "worried about what pharmacist I'm going to fire next?"; the apparent discrepancy between Yee's testimony that as of October 25 she did not know Tsahas's job was in jeopardy and Myers's testimony that as of October 23 she had concluded and reported to Correa, Yee, and Moser that Tsahas had engaged in or allowed misconduct and should be suspended; how Myers came to that conclusion when she admitted she did not understand the 340B Program; the contradictions over who made the decision to suspend and fire Tsahas (Myers or Correa or someone else); the starkly different accounts of what was or was not said by who in all of the various meetings on the subject of rising pharmacy costs in October 2019 (which are in essence a classic "swearing contest" which cannot be resolved on summary judgment); and finally, Tsahas's exceptional performance over the course of more than 20 years as a Pharmacy Director up and until October 2019.

Finally, while the law does not require that St. Catherine's belief as to Tsahas misconduct to have turned out to be true, as Plaintiff notes, in the weeks after her suspension and before she was fired and even for months thereafter, there was never any objective confirmation of the supposed change in the lookback period. Defendants explain that they did not need verification because Tsahas admitted that the lookback period was changed in her conversations with Trumbo—a fact which is hotly disputed. Defendants point out that a 340B compliance audit was *requested* before they decided to suspend or fire Tsahas; but contend the audit was unrelated to the decision to terminate Tsahas and Defendants certainly did not wait for the results of any audit before taking action. Moreover, Tsahas contends that the audit that was performed after she was fired suggested *too many*, not too few, patients were being qualified under St. Catherine's 340B Program. DE 152 at ¶ 60. Defendants disagree that this conclusion is inconsistent with their stated reasons, but from what the parties have presented to the Court, it cannot cut through the thicket sufficiently to say this issue is undisputed. And the fact that Tsahas has presented evidence that St. Catherine agents made statements to at least one other person and a regulatory agency that she was terminated because she over-qualified patients in violation of 340B regulations raises more disputed issues about the legitimacy or pretext of Defendants' stated reasons. Finally, within the context of all these disputed material facts, Defendants' stated termination reason that Tsahas was "evasive" in her interview with Myers is frankly too malleable to rule out pretext. It will be for the jury to decide whether Tsahas was fired for legitimate or pretextual reasons.

**D. Whether Plaintiff's Defamation Claim Survives**

Having found that Defendants are not entitled to summary judgment on Plaintiff's FCA retaliation claim, the Court must address the other claim in this lawsuit: that Defendants (via its employees Yee, Clements, and Michelle Myers) defamed Plaintiff under Indiana law. "To establish a claim of defamation, a plaintiff must establish (1) the existence of a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages." *Neff v. Wal-Mart Stores E., LP*, 113 N.E.3d 666, 674 (Ind. Ct. App. 2018) (citation omitted). "Any statement actionable for defamation must not only be defamatory in nature, but false." *Trail v. Boys & Girls Clubs of Nw. Indiana*, 845 N.E.2d 130, 136 (Ind. 2006).

Defamatory statements come in two varieties: "defamatory *per se*" and "defamatory *per quod*." *Kelley v. Tanoos*, 865 N.E.2d 593, 596–97 (Ind. 2007). "A communication is defamatory *per se* if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct. *Id.* (citation omitted). "All other defamatory communications are defamatory *per quod*. *Id.*" The two types of defamation share four comment elements: "(1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages." *Id. (*citing *Schrader v. Eli Lilly and Co.,* 639 N.E.2d 258, 261 (Ind. 1994)). The only difference is that when a plaintiff sues for defamation *per se*, she "is entitled to presumed damages 'as a natural and probable consequence' of the *per se* defamation," where defamation *per quod* requires a showing of "special damages." *Id.* (quoting *Rambo v. Cohen,* 587 N.E.2d 140, 145 (Ind.

Ct. App. 1992)). "When a statement is capable of either a defamatory or non-defamatory interpretation, the determination is a question of fact for the jury." *Glasscock v. Corliss*, 823 N.E.2d 748, 753 (Ind. Ct. App. 2005) (citing *Lovings v. Thomas,* 805 N.E.2d 442, 447 (Ind. Ct. App. 2004)).[8] Tsahas does not point to any special damages (such as lost wages), so her only possibly viable claim would be for defamation *per se*. Defendants argue that even if damages are presumed, the undisputed evidence still shows that Plaintiff cannot succeed on this claim as a matter of law. The Court disagrees.

First, while the parties disagree as to the precise contours of which statements are at issue and whether they were defamatory, and who all made them, Plaintiff's defamation claims boil down to the fact that the three individuals in question "told third parties that Plaintiff was terminated for 340B violations and/or for over qualifying ineligible patients to the 340B Program." DE 139 ¶ 193. As such, the Court will analyze the defamation claim as to statements implicating violations of the 340B Program.[9]

Defendants argue that statements allegedly made by Yee to JoAnn Birdzell, a former St. Catherine CEO and friend of Tsahas, fail as a matter of law because

---

[8] While the Indiana Supreme Court has long recognized that some employment-related communications are subject to a "qualified privilege," neither party raises the privilege nor argues it applies here so the Court will not either. *See Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992).

[9] As Defendants point out, any alleged defamation relating to Plaintiff being escorted off the premises by security guards, seems inactionable as a matter of law because Plaintiff admits she was in fact escorted out of the office without incident when she was fired. DE 150 at 12. Plaintiff does not contest this in her response, waiving any argument to the contrary, and the Court thus will not analyze those statements further.

Birdzell declared that the allegedly defamatory statement (that Plaintiff "had been fired for violations of the 340B program and for over-qualifying patients for the 340B Program") did not comport with what Birdzell knew of Tsahas. DE 140-8 ¶¶ 5-6. According to Defendants, because Birdzell did not believe the statement, there could be no harm to Plaintiff and therefore no defamation.

Defendants' argument, which relies on the Restatement (Second) of Torts § 563, cmt. b which states that "although the person making the communication intends it to convey a defamatory meaning, there is no defamation if the recipient does not so understand it" and the Third Circuit's opinion in *Nanavati v. Burdette Tomlin Mem. Hosp.*, 857 F.2d 96, 107-108 (3d. Cir. 1988) which interpreted New Jersey law, is unpersuasive. Concerning the quotation from the Restatement (Second) of Torts, the Court believes that Defendants misinterpret what "understand it" means in this context. The entirety of comment b reads:

> If the maker of the communication intends to defame the other and if the person to whom it is made so understands it, the meaning so intended and understood is to be attached thereto. This is so although the meaning is so subtly expressed that the ordinary person would not recognize it.
>
> On the other hand, although the person making the communication intends it to convey a defamatory meaning, there is no defamation if the recipient does not so understand it. This is true although the defamatory meaning is so clear that an ordinary person would immediately recognize it.

Restatement (Second) of Torts § 563, cmt. b (1977). The comprehension or understanding at issue is not whether the recipient believes the statement's defamatory statement to be true, it is whether the recipient understands the statement to be defamatory. Those are two distinct things. Here, Birdzell may have

doubted Yee's statement because it did not comport with what she knew of Tsahas, but that does not mean Birdzell did not understand the statement to be defamatory of Tsahas as a matter of law.

The Third Circuit's opinion in *Nanavati*, which again interpreted New Jersey rather than Indiana law, is likewise inapplicable. In that case, the court set aside a defamation award where the alleged statements were either merely unactionable opinions and where "the injury alleged here borders on the metaphysical" because "no one who heard the slander believed it, and those who repeated the slander did so only to express outrage at the speaker." *Nanavanti*, 857 F.2d at 109; *id.* ("The entire situation seems more like a fiendish law school hypothetical gone amok than a compensable claim for slander."). The facts and law of that case have little to no relevance to this one for several reasons.

First, Tsahas's claim is under Indiana not New Jersey law. Two, she is proceeding under a defamation *per se* claim where damages can be presumed under Indiana law, so even perhaps where the only injury "borders on the metaphysical," *Nanavanti*, 857 F.2d at 109, she has a claim because that is what nominal damages are for. Third, the statements at issue, that Tsahas "had been fired for violations of the 340B program and for over-qualifying patients for the 340B Program" are specific factual statements and not opinions. A listener could certainly interpret them as defamatory as well, especially to other members of the medical administration or pharmaceutical regulatory community as Tsahas claims. And when a statement is

fairly "capable of either a defamatory or non-defamatory interpretation, the determination is a question of fact for the jury." *Glasscock*, 823 N.E.2d at 753.

Next, Defendants argue that similar statements made by other employees, Clements and Michelle Myers are too "riddled with hearsay" DE 131 at 16, to support a defamation claim. Defendants posit that defamation based on hearsay is "well established" to be "patently insufficient." DE 131 at 15 (citing *W.S.K.* v. M.H.S.B., 922 N.E.2d 671, 696 (Ind. Ct. App. 2010) and *Thompson v. City of Indianapolis*, 2014 WL 1017970, at *2, n. 1 (S.D. Ind. Mar. 14, 2014)). While it is certainly true that inadmissible evidence (*e.g.*, hearsay) cannot support a defamation claim (or *any* claim for that matter), under Rule 801(d)(2) of the Federal Rule of Evidence, statements made by an opposing party (or their agents if it is a matter within the scope of their agency) are "not hearsay." Fed. R. Evid. 801(d)(2). All of the statements at issue were spoken by Defendants' employee-agents and neither side has briefed whether the alleged statements fall into this category or are otherwise admissible under the Federal Rules of Evidence. As such, this is a matter better suited for a motion *in limine* rather than a basis to grant summary judgment.

Finally, in her response brief, Tsahas also identifies statements she learned about only through discovery which were made by Correa in "self-reports" submitted to HRSA, the division of the Department of Health and Human Services which oversees the 340B Program. In the report, dated May 1, 2020, or approximately six months after Tsahas was fired, states that Defendants took "corrective action" to "prevent reoccurrence of the non-compliance discovered at the Retail Pharmacy"

including "terminat[ing] the pharmacists directly responsible for ensuring that the Retail Pharmacy was operating in compliance with 340B Program requirements…" DE 138 at 25.

Defendants make several passing arguments in response to this newly identified and allegedly defamatory statement, suggesting it is not clear if Tsahas is one of the "pharmacists" being referenced by Correa; if the statement simply acknowledges the fact she was terminated (which is true and therefore not defamatory) or if the statement implies she was terminated for failing to abide by the 340B Program's requirements (which could be potentially defamatory); and whether the statement is subject to any qualified privilege.[10] DE 150 at 15.

Perfunctory arguments are waived. *United States v. McGhee*, 98 F.4th 816, 824 (7th Cir. 2024). And regardless, as with the statements Yee allegedly made to Birdzell, when a statement is fairly "capable of either a defamatory or non-defamatory interpretation, the determination is a question of fact for the jury." *Glasscock*, 823 N.E.2d at 753. The lack of specific identification of Tsahas by name as one of "the pharmacists" could likely defeat this claim, but at summary judgment on this record, the Court cannot make that determination as a matter of law.

In sum, Plaintiff has brought forth sufficient evidence to bring her defamation claim to a jury. Before evidence is presented at trial, however, the Court intends to

[10] While Defendants did not raise the issue of a qualified privilege relating to regulatory communications in their original brief, only in their reply brief, the Court does not find any waiver. Plaintiff raised the letter as a defamatory communication for the first time in response to Defendants' motion, and Defendants are merely responding, albeit perfunctorily, to Plaintiff's claim. This further supports the need for Plaintiff to clarify the scope of her defamation claim before trial.

require Plaintiff to more concretely delineate the allegedly defamatory statements (including the who, what, where, and when of the allegations) based on the evidence she anticipates introducing at trial through an appropriate pretrial filing or before the case is submitted to the jury.

**Conclusion**

For the reasons discussed, Defendants' Motion for Summary Judgment [DE 130] is **DENIED**.

So ORDERED this 5th day of November 2026.

*/s/ Abizer Zanzi*
MAGISTRATE JUDGE ABIZER ZANZI
UNITED STATES DISTRICT COURT